(71 South. 581)

No. 20255.

RIZAN v. RIZAN et al.

(April 3, 1916. Rehearing Denied April 24, 1916.)

*(Syllabus by the Court.)*

1. INTEREST ⚖➡67 — VERBAL CONTRACTS — QUANTUM OF EVIDENCE.

The uncorroborated testimony of the maker of a note promising to pay a fixed sum with interest, upon which the past-due interest exceeds $500, is insufficient to establish, as against his coheirs of the deceased holder, a verbal agreement with such holder that no interest would be charged.

[Ed. Note.—For other cases, see Interest, Cent. Dig. §§ 155, 156; Dec. Dig. ⚖➡67.]

2. DESCENT AND DISTRIBUTION ⚖➡109—SUCCESSION—COLLATION.

A debt, due by way of interest, but alleged to have been remitted, is subject to collation as is any other debt.

[Ed. Note.—For other cases, see Descent and Distribution, Cent. Dig. §§ 416, 419, 420; Dec. Dig. ⚖➡109.]

3. EVIDENCE ⚖➡230(5)—STATEMENTS OF VENDOR.

The statements of the deceased vendor, though made out of the presence of the vendee, in regard to a sale, attacked as fraudulent, simulated, or a disguised donation, are admissible in evidence to show such vendor's attitude of mind towards the transaction, though not, of itself, sufficient to prove fraud or illegality in the vendee.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 848; Dec. Dig. ⚖➡230(5).]

Appeal from Twentieth Judicial District Court, Parish of Lafourche; W. P. Martin, Judge.

Action by Mrs. Marie Rizan, wife of Albert J. Le Blanc, against Pierre N. Rizan and others. From a judgment for defendants, plaintiff appeals. Reversed and rendered.

Caillouet, Caillouet & Howell, of Thibodaux, for appellant. J. A. O. Coignet, of Thibodaux, for appellee Pierre N. Rizan. Beattie & Beattie, of Thibodaux, for appellee René Rizan.

### Statement of the Case.

MONROE, C. J. Plaintiff brings this suit against her two brothers and coheirs, Pierre and René Rizan, praying that two, "so-called" sales of real estate, the one of date March 20, 1911, from Pierre to their mother, and the other, of date August 2, 1911, from their mother to René, be decreed—

"fraudulent simulations, in the interest and to the advantage of the said Pierre Rizan and René Rizan, and part and parcel of a scheme of the two to acquire the property in question free and unincumbered, as herein alleged; and that Pierre Rizan collate and pay into the succession of his mother * * * the balance, due on the purchase price of the property acquired by him from his mother on August 20, 1884, represented by his notes of $1,666.66⅔ each, dated the same day, bearing interest at the rate of 8 per cent. per annum from date until full and final payment, and due March 1, 1886, and 1887, respectively, for partition among the heirs; or, if the court should hold the so-called sale from Pierre N. Rizan to his mother * * * on March 20, 1911, to be real and for a sufficient consideration, then, the so-called sale from Mrs. * * * Rizan to René Rizan, of date August 2, 1911, is a mere sham and fraudulent simulation, devised to conceal a disguised donation, and that the same be collated and returned to the succession by the said René Rizan, for partition among the heirs; or, if the court should find that there was a consideration given and paid for the property, then, that the sum was inadequate and below the actual value of the property at the time, and that there was an undue advantage given by Mrs. Rizan to the said René Rizan over her other children, and ordering said advantage to be collated by the said René Rizan and returned to his mother's succession for partition among the heirs, according to law."

The two defendants affirmed the good faith and validity of the transactions which are attacked, and the trial court gave judgment in their favor. Plaintiff prosecutes the appeal.

It appears from the evidence that the father of the litigants died in 1881, and we infer that his succession was settled, and that the heirs received their respective portions. Pierre Rizan, at the time of his father's death, was 16 years old, and René 11, and they, with their sister (plaintiff herein), continued to live with their mother, who appears to have owned the home in which they lived, and in which, also, a business of some kind was conducted in the name of Rizan & Rossie, of which firm Mrs. Rizan was the senior member. The property was situated in the village of Longueville, on the left bank of Bayou Lafourche, and the lot measured, say, 54 feet front on the bayou by an average depth of, say, 224 feet. Mrs. Rizan also owned a lot in Lockport, on the right bank of the bayou, the dimensions of which are not given. According to his testimony, Pierre Rizan was employed, in January, 1882, by Rizan & Rossie, as clerk, at $30 a month (he being then 17 years old), and, while in that employment, in October, 1883, he was married and took his wife to his mother's house, where he himself lived. In August, 1884, Mrs. Rizan executed an act of sale, purporting to convey to Pierre the two properties owned by her, for the price of $6,031.66⅔, of which $1,031.66⅔ are said to have been paid in cash, and the balance of $5,000 by three notes, of $1,666.66⅔ each, of even date with the act, bearing interest at 8 per cent. from date and made payable March 1, 1885, 1886, and 1887, respectively. He says that in January, 1885, the stock in trade, open accounts, and business of Rizan & Rossie were turned over to him in consideration of his assuming the debts of the concern, amounting to about $1,700; that the stock in trade was worth about $1,000, and that he collected $1,200 or $1,300 of the open accounts, and paid the debts in March, following his acquisition of the business; that he conducted the business for his own account for 4 or 5 months, and then took Le Blanc into partnership with him; and that, at the expiration of some 18 or 24

months, the firm failed and paid nothing to its creditors; that he "loafed" for 2 months and then opened a barroom, in the same place in which he had been conducting his business, and carried it on for 10 or 11 years, in the name of his wife; that he then gave up the barroom and was employed by his brother, René (who appears to have opened a store in place of the barroom), as a clerk, and so remained until April, 1912, after which he again "loafed" for 5 months, when, having been advised that the judgments which had been obtained against him had become prescribed, he again went into business for himself.

He testifies that when, in August, 1884, he bought the properties from his mother, he made the cash payment of $1,031.66⅔ from money which he had received from the succession of his father; that he made a further cash payment in January, 1885, from proceeds of the sale of the lot in Lockport, which he had acquired from his mother and which he sold, during that month, for $3,090, and that he paid $2,000 more in 1886, thus reducing his original indebtedness for the price of the property to $2,000, which was represented by one of the notes for $1,666.66⅔ and a balance of $333.33⅓ due upon the remaining note. He also testifies that his mother "had agreed not to charge him any interest on the notes, and she was to remain in the building;" that he charged her nothing for her board while she stayed with him; that she took into the house an orphan girl (for whom he made no charge), though at what time does not appear, and he admits that the girl was married and left the house in 1888, and that while in the house she did some of the housework. He also testifies that his mother had his brother René in the house, and that he attended school; and he refers to the presence of his sister, but admits that she was married, and left the house in 1884. He nowhere

definitely states that it was agreed between his mother and himself that she should remit the interest on his notes as a consideration for her board and lodging or that of his brother and of the orphan girl. On the other hand, the impression which the evidence, taken as a whole, leaves upon the mind, is that defendant's mother continued to be a very active and efficient member, if not the mistress, of the household, after defendant's marriage, as she had been before. We infer, for instance, that prior to his marriage she had done the cooking for the family, and perhaps the housework as well. Defendant was probably between 18 and 19 years of age when he brought his wife to the house, and he testifies that she thereafter did the cooking, and that the orphan girl, after her arrival, did some of the housework; but he also testifies that his wife gave birth to children, and it is fair to presume that some of them were born between the date of his marriage, in October, 1883, and that of his departure from the house, in 1890, and that their mother did no cooking, or other work, during her confinements. Moreover, though defendant's examination in regard to his mother's activities during that period seems to have been somewhat overlooked, the evidence is abundant to the effect that, during all the subsequent years of her life, from 1890 until within 6 weeks of her death, in October, 1911, she was always a busy woman, assisting in the care of the house, and, particularly, of her grandchildren, and looking after the raising of chickens, etc. Referring to those years when René Rizan was "in charge" of the house, Mrs. Le Blanc (speaking of her mother) says:

"It was she who attended to the children. She assisted in attending to the children, and it was she who did the greater part of the kitchen work. * * * She cooked and would put things to rights afterwards. Q. Did she do this occasionally or habitually? A. Generally."

And there are other (disinterested) witnesses who corroborate Mrs. Le Blanc, to the

effect that her mother (during her stay with René) assisted with the children, and who also testify that she attended to the chickens and did a little of everything about the house, including the cooking (not meaning, however, that she did all of the cooking). Pierre Rizan himself testifies as follows on that subject (quoting in part):

"Q. What did she do while René Rizan was living with her, before she was taken sick? A. What did she do? Q. Did she perform any of the household duties? A. She stayed there with my brother. * * * Q. Did she do any sort of work about the house? A. Oh, I guess she did. Q. Don't you know, Mr. Rizan, that she did the cooking for that family? A. No, sir; she didn't do all the cooking. Q. Didn't she assist in doing the cooking? A. She helped his wife. * * * Q. She helped to do what? A. Well, she helped, she gave help to raise the children, and everything."

Having testified that the business and assets of Rizan & Rossie were turned over to him in January, 1885, in consideration of his assumption of the debts of that concern, that the stock on hand was worth $1,000, that he collected $1,200 or $1,300, and was unable to say how much more, from the open accounts, and that the debts amounted to about $1,700, and were paid by him within 3 months, he further, and in another connection, says that Rizan & Rossie failed in 1884. "They lost everything they had. I call it bankruptcy. I don't know what it is. * * * She [his mother] was sued and judgments obtained against her and Rossie." And he says that, thereafter, his mother has had no business, and hence that he was not her agent, which is his explanation of a professed total ignorance of the disposition made by her of the $4,000 in cash, which he says he paid her within a period of 2 or 3 years, though he knew of no safe place in the house where she could have kept it, no one ever heard of her spending any money after he left the house, in 1890, and she left absolutely nothing, so far as known, at her death.

René Rizan was married in 1890 (at the age of 20 years), and he, too, brought his wife to the common dwelling, whereupon Pierre, with his family, moved elsewhere, and the theory of the defense is that René, who up to that time we are to suppose was maintained at the expense of his mother and brother, at once took charge of the house, and thereafter maintained his mother, until her death in October, 1911, and his own family, increased by 13 children, of whom 10 were living at the time of the trial. We hear nothing of any charge by Pierre against René for the latter's occupancy of the premises, but both of the sons charge their mother for her occupancy from 1890 to 1911, in addition to the charge which Pierre makes for the period from 1884 to 1890.

On March 20, 1911, Pierre executed an act reconveying to his mother, for the recited consideration of $2,000 cash, that portion of the premises (constituting, approximately, one-half of the lot) upon which is situated the house wherein she with René and his family lived, reserving the other half for himself. He testifies that the real consideration was the surrender and cancellation of his two notes, to which we have referred, representing, in principal, $2,000, and, with interest, the additional sum of, say, $4,253.33. On August 2d, following, Mrs. Rizan executed an act purporting to convey the property so acquired to René, for the recited consideration of $1,000 cash, after which, on October 16, 1911, she died, leaving nothing of value, so far as known.

René testifies that he was not aware of the conveyance from Pierre to his mother; that he did not ask his mother to convey the property to him; that she made the offer; that the bargain was made in a single conversation; that he was unable to remember in what part of the house or at what time of day it had taken place, or whether 1, 2, or 3 weeks, a month, 6 months, a year, or 2 years before the conveyance to him. He was then asked whether it was 3 years, and

he replied: "Oh, no; now you are going too far;" and he finally stated that it might have been a couple of weeks, he could not say.

The $1,000 was counted, at his particular request, by the two witnesses to the act, and one of them testifies that it was handed to the notary, and that the notary handed it to Mrs. Rizan, which was all that he knew of the matter. It appears that 2 weeks after the act had been executed, Mrs. Rizan paid her daughter a visit, and plaintiff's counsel offered her as a witness to testify that Mrs. Rizan then told her daughter "that the money, if any had been paid on the occasion of the sale, was, as soon as counted out, taken back by the said René Rizan, immediately after the officers of the sale and the witnesses had left the room, and that she (Mrs. Rizan) had received no part of the money," which testimony, upon objection by defendants' counsel, was excluded by the court. Mrs. Rizan, shortly afterwards, was taken sick, and died after an illness of 6 weeks. René Rizan testifies that she left no money that he knew of, and the $1,000 which is said to have been paid to her remains unaccounted for.

His testimony reads, in part, as follows:

"Q. Your mother never had a cent during the whole time she was with you? A. I paid everything she wanted. Q. She never bought anything? A. I could not say as to that. * * * Q. You supplied her with everything that she needed? A. Everything, sir; her clothes, paid her medicines, and everything. * * * Q. Your mother died, when? A. In October. * * * Q. She didn't have a nickel? A. I don't know. * * * Q. She died at your house? A. Yes, sir. Q. You paid her funeral expenses? A. Yes, sir. Q. So there was not a cent to bury her? A. I don't know; I didn't see it. Q. Now, Mr. Rizan, if your mother had had money, would you not, necessarily, have found it after her death? A. I have not found it; she went to my sister's 2 weeks after the sale was done. Q. How long did she remain at your sister's? A. Fifteen days. * * * Q. The bargain was that you were to give her $1,000? A. Yes, sir. Q. That was the whole bargain? A. And some other consideration. Q. What was the other consideration? A. I just told you—by keeping her at home and giving her everything that she needed. Q. What was that consideration valued at? A. Well, I had the doctor's bill; I paid at least $700 or $800, because she stayed sick for 3 or 4 years, off and on. * * * Q. You had no bargain or arrangement with her in regard to the compensation that she was to make you for the services rendered to her? A. No, sir."

It is admitted that Mrs. Rizan was never sick in bed prior to the occasion of her last illness, and no witness was called to corroborate the testimony of the defendant as to medical bills, or any other bills, paid for her account.

## Opinion.

[1] Construing the testimony of Pierre Rizan to mean that there was an agreement to the effect that, in consideration of her board and lodging, Mrs. Rizan was to remit the interest on the notes, the most that could be said would be that the interest was remitted up to 1890, when Pierre left the house and René took charge of it; but, as against his indebtedness for interest, evidenced by written instruments, Pierre is charging his mother for board and lodging from 1884 until March 20, 1911; and, as part of the price of the property conveyed to him in 1911, René is charging his mother for board and lodging from 1890 until her death on October 16, 1911; so that there is a double charge, for the same thing, for the period between 1890 and 1911.

[2] Pierre Rizan's testimony, however, though sufficient to show that he made no charge against his mother for board and lodging, is insufficient, in view of his written promise, of the fact that his mother is no longer living, of the testimony itself, and of the surrounding circumstances, to prove the agreement that she was to charge him no interest on the notes. She had just turned over the business of Rizan & Rossie to him, and, by the sale of her property, she had put him in a position to realize $3,090 (of which over $1,000 was cash) in January, 1885, by the sale of the lot in Lockport, from

which latter circumstance it is evident that if she retained a mortgage and vendor's privilege to secure the credit portion of the price of the property, when she sold it to Pierre, she must have abandoned that security and have given him a free hand to dispose of the property and pay her as, and when, he pleased; and, as he had been but recently married and was thus enabled to make a start in business, and the person who assisted him was his mother, who had turned over to him the last bit of property that she had in the world, including the home in which she lived, he might very well have agreed, as he did, to make no charge for allowing her to remain where she was, or for providing her with food while she so remained. Moreover, the condition in life of the parties, the character and habits of Mrs. Rizan, and all of the surrounding circumstances considered, we are satisfied that Mrs. Rizan's services in and to the family were worth more than her board and lodging. On the other hand, if there was any agreement, when the act of conveyance was signed, that Pierre was to pay no interest on the notes, it meant that she was, in effect, to pay $400 a year (being 8 per cent. interest on $5,000 that she was to lose) for her board and lodging, which would have been an utterly unreasonable amount to have exacted. As matters stood, in 1911, when Pierre reconveyed part of the property to her, she held his notes, aggregating $2,000, upon which the past-due interest amounted to $4,253.33, and we have only his uncorroborated testimony to the effect that his written obligation to pay that interest had been canceled by a verbal agreement with the holder of the notes who is no longer living to give her version of the matter. The testimony, we think, all the circumstances considered, is insufficient. C. C. 2277; State ex rel. Carl v. Judge, 37 La. Ann. 380; Lazarus v. Friedrichs, 117 La. 714; 42 South.

230. And the amount due for the interest should be collated to the extent necessary to satisfy the demands of plaintiff.

[3] The testimony of plaintiff, to the effect that her mother told her that the $1,000, which was handed to her upon the occasion of the conveyance to René Rizan, had been immediately returned to him, was admissible, at least for the purpose of showing the attitude towards the transaction of Mrs. Rizan. Guidry v. Grivot, 2 Mart. (N. S.) 13, 14 Am. Dec. 193; Martin v. Reeves et al., 3 Mart. (N. S.) 22, 15 Am. Dec. 154; Groves v. Steel et al., 2 La. Ann. 480, 46 Am. Dec. 551; Erwin v. Bank of Kentucky, 5 La. Ann. 1; Carrollton Bank v. Cleveland, 15 La. Ann. 616; Hoose & Victor v. Robbins, 18 La. Ann. 648. Without that testimony, the transaction bears the earmarks of a disguised donation, but we prefer that the witness should be heard. It is therefore ordered that the judgment appealed from be annulled, and that there now be judgment in favor of plaintiff and against the defendant Pierre N. Rizan in the sum of $1,417.77, with legal interest thereon from judicial demand, being the one-third part of the collation due by him on account of unpaid interest on his notes, surrendered to him by the decedent, his mother, on March 20, 1911. It is further ordered that said defendant be allowed one year within which to pay said sum, upon his furnishing plaintiff with his obligation, payable at the expiration of that period, bearing interest at the rate of 8 per cent. per annum from date, and secured by special mortgage on unincumbered immovable property in the parish of Lafourche.

It is further decreed that, as to the claim against the defendant René Rizan, the case be remanded, with instructions to the district court to hear the testimony of the plaintiff concerning statements said to have been made by the decedent, Mrs. Widow Pierre Rizan, in regard to, and after, the

alleged sale by her to René Rizan, of August 2, 1911, and as to her receipt and return of the price, as also, such competent testimony as defendant may offer in rebuttal thereof.

It is further decreed that defendants pay the cost of the appeal; that defendant Pierre N. Rizan pay one-half of the costs of the district court, and that the question of liability for the other half await the final judgment as between plaintiff and the other defendant.